**No. 16-56843**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

VIDANGEL, INC.,

*Defendant-Appellant*,

v.

DISNEY ENTERPRISES, INC.; LUCASFILM LTD. LLC;
TWENTIETH CENTURY FOX FILM CORPORATION; AND
WARNER BROS. ENTERTAINMENT, INC.,

*Plaintiffs-Appellees*.

On Appeal from the United States District Court
for the Central District of California
Hon. André Birotte Jr.
No. 2:16-cv-04109-AB-PLA

## APPELLANT'S OPENING BRIEF

Brendan S. Maher
Daniel L. Geyser
Douglas D. Geyser
STRIS & MAHER LLP
6688 N. Central Expy., Ste. 1650
Dallas, TX 75206
Telephone: (214) 396-6630
Facsimile: (210) 978-5430

January 11, 2016

Peter K. Stris
Elizabeth Rogers Brannen
Dana Berkowitz
Victor O'Connell
STRIS & MAHER LLP
725 S. Figueroa St., Ste. 1830
Los Angeles, CA 90017
Telephone: (213) 995-6800
Facsimile: (213) 261-0299
peter.stris@strismaher.com

***Counsel for Defendant-Appellant VidAngel, Inc.***
(Additional counsel on signature page)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant VidAngel, Inc., hereby files its corporate disclosure statement as follows. VidAngel, Inc. is a privately held corporation. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated: January 11, 2016            Respectfully submitted,

<u>/s/ Peter K. Stris</u>
Peter K. Stris
  peter.stris@strismaher.com
STRIS & MAHER LLP
725 S. Figueroa St., Ste. 1830
Los Angeles, CA 90017
Tel:   (213) 995-6800
Fax:   (213) 261-0299

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF AUTHORITIES.....................................................................iv

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION ...........................................................3

STATEMENT OF ISSUES .....................................................................3

STATEMENT OF THE CASE...................................................................4

    A.    Studio Control Over The Home Movie Market ...................................4

    B.    Studio Efforts To Thwart Home Movie Filtering.................................8

    C.    The Founding And Growth Of VidAngel.............................................10

    D.    The Litigation ...................................................................14

STANDARD OF REVIEW ......................................................................15

SUMMARY OF ARGUMENT..................................................................15

ARGUMENT .....................................................................................17

I.    The District Court Abused Its Discretion In Finding The Studios Demonstrated Likelihood Of Success On Their First Cause Of Action: Copyright Infringement Under 17 U.S.C. § 106 ...........................17

    A.    The FMA Authorizes Filtering That Satisfies Certain Conditions......17

    B.    VidAngel's Filtering Satisfies The FMA's Conditions........................20

        1.    The reproduction claim is unlikely to succeed .........................21

        2.    The public performance claim is unlikely to succeed ..............23

    C.    VidAngel's Service Is Also A Protected Fair Use ..............................26

II.     The District Court Abused Its Discretion In Finding The Studios Demonstrated Likelihood Of Success On Their Second Claim: Access Control Circumvention Under 17 U.S.C. § 1201(a) .........................32

    A.     The DMCA Prohibits The Unauthorized Circumvention Of Access Protections, *Not* Copy Protections .............................................33

    B.     VidAngel Does Not Circumvent Access Control Protections Because It Is Authorized By The Studios To Avoid Them.................35

    C.     VidAngel Offers The Only Reading Of Section 1201(a) That Can Be Reconciled With The FMA, A Later-Enacted Statute............39

    D.     Any Technical Violation Of Section 1201(a) By VidAngel Is A Protected Fair Use.........................................................................43

III.    The District Court Abused Its Discretion In Finding That The Studios Demonstrated A Likelihood Of Irreparable Harm..........................................48

    A.     Harm Must Be Proven, Not Presumed, And The Studios Offered No Evidence That VidAngel's Continued Operation During The Litigation Was Likely To Cause Irreparable Harm..........48

    B.     The Studios' Year-Plus Delay Precludes A Preliminary Injunction..................................................................................................52

IV.     The Balancing Of Hardships Requires Reversal ...........................................53

V.      The Injunction Harms The Public Interest ....................................................56

CONCLUSION................................................................................................................60

STATEMENT OF RELATED CASES ......................................................................61

CERTIFICATE OF COMPLIANCE .........................................................................61

# TABLE OF AUTHORITIES

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ...............................................................53

*Am. Broad. Cos. v. Aereo*,
134 S. Ct. 2498 (2014) ..............................................................24, 25, 26, 27

*Amylin Pharm., Inc. v. Eli Lilly & Co.*,
456 F. App'x 676 (9th Cir. 2011) ...........................................................53

*Apple Comput., Inc. v. Formula Int'l, Inc.*,
725 F.2d 521 (9th Cir. 1984), *overruled by Flexible Lifeline*,
654 F.3d 989 (2011) ...............................................................................56

*Benda v. Grand Lodge of Int'l Ass'n of Machinists*
*& Aerospace Workers*, 584 F.2d 308 (9th Cir. 1978)............................57

*Bethesda Softworks, LLC v. Interplay Entm't Corp.*,
452 F. App'x 351 (4th Cir. 2011) ..........................................................50

*Brookfield Commc'ns v. W. Coast Entm't Corp.*,
174 F.3d 1036 (9th Cir. 1999) ...............................................................15

*Cabell v. Markham*,
148 F.2d 737 (2d Cir. 1945) ..................................................................41

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).........................................................................30, 45

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) .............................................................24, 26

*Castle Rock Entm't v. Carol Publ'g Grp.*,
150 F.3d 132 (2d Cir. 1998) ..................................................................44

*Columbia Pictures Indus., Inc. v. Aveco, Inc.*,
800 F.2d 59 (3d Cir. 1986) ....................................................................24

*Costar Grp., Inc. v. LoopNet, Inc.*,
   373 F.3d 544 (4th Cir. 2004) ....................................................................24

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ...................................................................50, 51, 56

*Fair Hous. Council of San Fernando Valley v. Roommates.com,*
   *LLC*, 666 F.3d 1216 (9th Cir. 2012) .......................................................47

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
   654 F.3d 989 (9th Cir. 2011) ....................................................50, 51, 56

*Folsom v. Marsh*,
   9 F. Cas. 342 (C.C.D. Mass. Oct. 1, 1841) ...........................................44

*Fox Broad. Co. v. Dish Network LLC*,
   160 F. Supp. 3d 1139 (C.D. Cal. 2015) .................................................25

*Golan v. Holder*,
   132 S. Ct. 873 (2012) ..............................................................................44

*Golden Gate Rest. Ass'n v. City of San Francisco*,
   512 F.3d 1112 (9th Cir. 2008) ...............................................................58

*Huntsman v. Soderbergh*,
   No. 02-cv-1662, 2005 WL 1993421 (D. Colo. Aug. 17, 2005) ..............9

*I.N.S. v. St. Cyr*,
   533 U.S. 289 (2001) ...............................................................................48

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
   4 F.3d 819 (9th Cir. 1993) .....................................................................56

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2002) .................................................................30

*Los Angeles Mem. Coliseum Comm'n v. Nat'l Football League*,
   634 F.2d 1197 (9th Cir. 1980) ...............................................................56

*LVRC Holdings LLC v. Brekka*,
   581 F.3d 1127 (9th Cir. 2009) ...............................................................36

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
    629 F.3d 928 (9th Cir. 2010) ..............................................................*passim*

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010) ......................................................................................43

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985) .....................................................................54

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys.,
    Inc.*, 180 F.3d 1072 (9th Cir. 1999) ...........................................................28

*Redbox Automated Retail LLC v. Universal City Studios LLLP*,
    No. 08-cv-766, 2009 WL 2588748 (D. Del. Aug. 17, 2009) ................................7

*Reno v. ACLU*, 521 U.S. 844 (1997) ..............................................................58

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .........................................50

*Sega Enters. Ltd. v. Accolade Inc.*, 977 F.2d 1510 (9th Cir.
    1992), *as amended* (Jan. 6, 1993) ..............................................................28

*Sony Comput. Entm't, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) .......................................................................28

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) .............................................................................5, 31, 32

*Stewart v. Abend*,
    495 U.S. 207 (1990) ...............................................................................28, 44

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ..............................................................55, 58

*Triad Sys. Corp. v. Southeastern Express Co.*,
    64 F.3d 1330 (9th Cir. 1995) .......................................................................56

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) .....................................................................24

*United States v. ASCAP*,
    627 F.3d 64 (2d Cir. 2010) ..........................................................................25

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) ................................................................37

*Watt v. Alaska*,
   451 U.S. 259 (1981) ..............................................................................44

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ..............................................................................58

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) .............................................................................*passim*

**Statutes**

U.S. Const. Art. I, § 8, cl. 8 ......................................................................47

Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* ...............................*passim*

   17 U.S.C. § 106............................................................................*passim*

   17 U.S.C. § 106(1) .......................................................................17, 21

   17 U.S.C. § 106(4) .......................................................................17, 24

Family Home Movie Act, 17 U.S.C. § 110(11) .................................*passim*

Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.*..........*passim*

   17 U.S.C. § 1201(a) .....................................................................*passim*

   17 U.S.C. § 1201(a)(1)(A) ..................................................................36

   17 U.S.C. § 1201(a)(1)(C) ..................................................................45

   17 U.S.C. § 1201(a)(1)(D) ..................................................................45

   17 U.S.C. § 1201(b) .....................................................................*passim*

   17 U.S.C. § 1201(b)(1) .......................................................................36

   17 U.S.C. § 1201(b)(2)(A)..................................................................36

17 U.S.C. § 1201(c)(1)............................................................................46

28 U.S.C. § 1292(a)(1)..............................................................................3

28 U.S.C. § 1331 ......................................................................................3

**Other Authorities**

11A Wright, Miller, & Kane, *Federal Practice and Procedure* (2d ed. 1995)

    § 2948.1................................................................................49, 54

    § 2948.4.........................................................................................58

150 Cong. Rec. H7659 (Sept. 28, 2004) ................................................20

151 Cong. Rec. S450 (Jan 25, 2005) .....................................................42

H.R. Rep. No. 105-551, pt. 1 (1998) ......................................................38

H.R. Rep. No. 105-551, pt. 2 (1998) ......................................................38

H.R. Rep. No. 109-33, pt. 1 (2005)...............................................9, 31, 40

S. Rep. No. 105-190 (1998) ....................................................................37

65 Fed. Reg. 64568 (Oct. 27, 2000)........................................................39

*Home Recording of Copyrighted Works: Hearing on H.R. 4783,*
    *H.R. 4794, H.R. 4808, H.R. 5250, H.R. 5488, and H.R. 5705*
    *Before the Subcomm. on Courts, Civil Liberties, and the Admin.*
    *of Justice of the H. Comm. on the Judiciary*, 97th Cong. 8 (1982) ......4

Family Entertainment and Copyright Act of 2005,
    Pub. L. No. 109-9, § 167, 119 Stat. 218, 223 (2005).........................42

Family Movie Act of 2004, H.R. Rep. No. 4586,
    108th Cong. § 2 (2004) .....................................................................41

*Family Movie Act of 2004: Hearing on H.R. 4586 Before the*
    *Subcomm. on Courts, the Internet, Intellectual Property of the*
    *H. Comm. on the Judiciary*, 108th Cong. 68 (2004)..........................40

*Derivative Rights, Moral Rights, and Movie Filtering Technology: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Prop. of the H. Comm. on the Judiciary*, 108th Cong. 122 (2004) ..............................................................9, 31, 43

Brief for Petitioners, *Aereo*, 134 S. Ct. 2498 (2014) (No. 13-461), 2014 WL 768315.................................................................................25, 27

Brief of the United States as Amicus Curiae Supporting Petitioners, *Aereo*, 134 S. Ct. 2498 (2013) (No.13-461), 2014 WL 828079 ..........................27

Transcript of Oral Argument, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) (No. 04-480) ...........................................29

Brooks Barnes, *Movie Studios See a Threat in Growth of Redbox*, N.Y. Times (Sept. 6, 2009)................................................................6, 7

Burk & Cohen, *Fair Use Infrastructure for Rights Management Systems*, 15 Harv. J.L. & Tech. 41, 46 (2001).........................................................48

Chuck Tryon, *Redbox vs. Red Envelope, Or What Happens When The Infinite Aisle Swings Through The Grocery Store*, 20 Canadian J. of Film Stud. 38, 41 (2011) ...........................................................7

Dan Ackman, *Movie Studios Get Hip with the Future*, Forbes (Aug. 17, 2001) ..............................................................................5

David Waterman & Sung-Choon Lee, *Time Consistency and the Distribution of Theatrical Films: An Empirical Study of the Video Window* 8, 32 (Allied Soc. Sci. Ass'ns Annual Mtg., Working Paper, Jan. 2003) ......................................................................6

*DEG Year-End 2006 Home Entertainment Sales Update*, The Digital Entm't Grp. (Jan. 8, 2007)................................................................6

Derek Khanna, *A Look Back at How the Content Industry Almost Killed Blockbuster and Netflix (and the VCR)*, TechCrunch (Dec. 27, 2013) ..............................................................................5

Entm't Merchs. Ass'n, *A History of Home Video and Video Game Retailing: 2000-Present* ..............................................................................6, 7

ix

Glynn S. Lunney, Jr., *The Death of Copyright: Digital Technology,*
*Private Copying, and the Digital Millennium Copyright Act*,
87 Va. L. Rev. 813 (2001) ...................................................................47

Jane C. Ginsberg, *Copyright Use and Excuse on the Internet*,
24 Colum.-VLA J.L. & Arts 8 (2000)...............................................47

Jeffrey C. Ulin, *The Business of Media Distribution:*
*Monetizing Film, TV and Video Content in an Online*
*World* (2d ed. 2015)...........................................................................6

John McLaughlin, Episode of the McLaughlin Group
(Sept. 27, 2002)...................................................................................9

Martha A. Field, *Sources of Law: The Scope of Federal Common*
*Law*, 99 Harv. L. Rev. 881 (1986)....................................................48

Matt Schruers, *The Public Costs of Private Distribution Strategies:*
*Content Release Windows As Negative Externalities*,
Project Disco (June 2, 2015) ..............................................................8

Michael Cornick, *Modern Film Censorship: Television, Airlines,*
*and Home Entertainment* 5 (2008) .....................................................8

Mike Snider, *DVDs Conquer the Movie World*, USA Today
(updated Oct. 18, 2002) ......................................................................6

Nelson Granados, *Changes To Hollywood Release Windows Are*
*Coming Fast And Furious*, Forbes (Apr. 8, 2015)..............................8

Peter M. Nichols, *Home Video*, N.Y. Times (July 12, 1996) ...................5

Press Release, *DGA Responds and Counterclaims Against Robert*
*Huntsman and Clean Flicks; Adds Motion Picture Studios to*
*Suit*, Directors Guild of America (Sept. 20, 2002) .............................8

Press Release, *Three Cheers! America Rents 3 Billionth Redbox*
*Disc*, Redbox (July 30, 2013) .............................................................7

Richard Cooper, *Studios Settle Dispute with Redbox*,
IHS Markit (May 12, 2010) .................................................................7

x

*Redbox Surpasses 100 Million DVD Rentals*,
  Kiosk Marketplace (Jan. 31, 2008)........................................................................7

**Rules**

Federal Rule of Appellate Procedure 4(a)(1)(A) .......................................................3

xi

# INTRODUCTION

Filtering is the practice of removing mature content—such as sex and violence—from movies. Streaming is the transmission of movies over the Internet. VidAngel, Inc. ("VidAngel") allows customers who buy physical DVDs or Blu-ray movie discs ("discs")—and thus have a right to view that movie—to create a personalized, filtered stream to watch in their homes. Unfiltered streams are not allowed, and the model is entirely disc-based and individualized. No stream is sent to anyone other than the disc-owner, and all streams are filtered according to that customer's personal filtering preferences.

Everything VidAngel does is for the sole purpose of allowing a disc-owner to watch a movie she owns the way she wants in her own home. Yet four Hollywood studios ("Studios") insist the Copyright Act prohibits what common sense demands. The Studios persuaded the court below not only of that, but also that tiny start-up VidAngel threatened irreparable harm to the richest entertainment companies on Earth. The district court entered an injunction that forced VidAngel to shut down, leaving millions of American families with no viable filtering option.

The injunction should be dissolved. There is no evidence of irreparable harm. And there is no reason to believe the Studios are likely to prevail on the merits of their Copyright Act claims.

1

In 2005, over the Studio's objections, Congress passed the Family Movie Act, whose *express purpose* was to confer upon households the right to watch filtered movies. Because that right arguably clashed with other rights granted to copyright holders, Congress amended the Copyright Act to make plain its intent to subordinate the latter to the former. *See* 17 U.S.C. § 110(11) ("Notwithstanding the provisions of section 106, the following are not infringements of copyright: * * * the creation or provision of a computer program or other technology that enables [filtering] if no fixed copy of the altered version of the motion picture is created * * * ."). Because VidAngel falls squarely within the FMA safe harbor, the Studios' first Copyright Act claim (infringement under section 106) fails.

The Studios assert a second, and equally baseless, Copyright Act claim (access control circumvention under section 1201). Section 1201 was intended to stop pirates from unlawfully accessing content by prohibiting decryption of discs without authorization. It is not violated by VidAngel or its customers who are *authorized* to decrypt each movie for viewing and filtering.

Even if there were merit to either of the Studios' Copyright Act claims, this case concerns paradigmatic fair use. Filtering a movie is profoundly transformative. That is why (1) the Studios fought it, (2) millions of families want it, and (3) Congress passed a law authorizing it. Nor does filtering hurt the Studios;

2

instead, it benefits them because it expands their market to people who otherwise would not watch their movies.

## STATEMENT OF JURISDICTION

This action arises under 28 U.S.C. § 1331 and the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"). The Studios allege that VidAngel violated 17 U.S.C. §§ 106 and 1201.

This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) because this appeal is taken from an order of the district court granting an injunction against VidAngel. The injunction was entered on December 12, 2016. ER1. Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A), VidAngel timely filed its Notice of Appeal on December 14, 2016. ER88.

## STATEMENT OF ISSUES

1.     Whether the Studios' claims that VidAngel's disc-based filtering business infringes upon their reproduction and public performance rights under 17 U.S.C. § 106 and violates the access-control provision of 17 U.S.C. § 1201(a) are likely to succeed on the merits.

2.     Whether the Studios are likely to suffer irreparable harm as a result of VidAngel's conduct.

3.     Whether the balance of equities justifies a preliminary injunction shutting down VidAngel's disc-based filtering business.

4. Whether a preliminary injunction that leaves the American public with no viable filtering option is in the public interest.

## STATEMENT OF THE CASE

The Studios have a long history of using litigation, lobbying, and dominant market position to influence the home movie market. For example, they have sued every technology company that has ever attempted to enable filtering. Their conduct forced Congress to amend the Copyright Act in 2005 to protect consumers and filtering companies like VidAngel.

### A. Studio Control Over The Home Movie Market

Motion pictures were designed for theaters. Technological innovations, however, have enabled a rapidly evolving market for home movie viewing.

*Videocassette Recorder ("VCR").* The Studios initially enlisted the courts and the legislature to protect them from the VCR, which enabled "time-shifting," i.e., the practice of recording for later playback. Motion Picture Association of America ("MPAA") head Jack Valenti famously testified before Congress that "the VCR is to the American film producer and the American public as the Boston strangler is to the woman home alone."[1]

---

[1] *Home Recording of Copyrighted Works: Hearing on H.R. 4783, H.R. 4794, H.R. 4808, H.R. 5250, H.R. 5488, and H.R. 5705 Before the Subcomm. on Courts, Civil Liberties, and the Admin. of Justice of the H. Comm. on the Judiciary*, 97th Cong. 8 (1982) (statement of Jack Valenti).

The Studios' scare campaign nearly succeeded. In 1984, the Supreme Court protected the VCR by a single vote. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). The Court immunized the VCR from the Studios' copyright claims on the grounds that "private, noncommercial time-shifting in the home" is non-infringing. *Id.* at 442.[2]

Ironically, the Studios' defeat enriched them. By 1995, more than half their domestic revenue came from home video, compared to less than a quarter from movie theaters.[3] Despite dire warnings, the VCR was not "the death knell of the movie business. Instead it became arguably its savior * * * ."[4]

In the 1980s, the Studios developed a business strategy called "release windows" to capture the greatest possible share of the new home movie market. They first released movies to be shown in theaters. Six months later, they sold VHS tapes for an exorbitant price (typically $70 to $108 at the time) so that only

---

[2] The Studios also lobbied for anti-VCR legislation *See* Derek Khanna, *A Look Back at How the Content Industry Almost Killed Blockbuster and Netflix (and the VCR)*, TechCrunch (Dec. 27, 2013), https://technology.ihs.com/402736/studios-settle-dispute-with-redbox.

[3] Peter M. Nichols, *Home Video*, N.Y. Times (July 12, 1996), www.nytimes.com/1996/07/12/movies/home-video-078344.html.

[4] Dan Ackman, *Movie Studios Get Hip with the Future*, Forbes (Aug. 17, 2001), www.forbes.com/2001/08/17/0817topnews.html.

rental businesses would buy them.[5] Months later (when rental demand subsided), they lowered the price of VHS tapes to encourage purchases by collectors.[6]

*Digital Video Disc ("DVD").* Then came the DVD.[7] Transition from VHS was swift: by 2006, Americans spent $22.8 billion on DVD sales and rentals, representing 99% of all home entertainment spending.[8] Unlike VHS tapes, the DVD consumer *sales* market was significant. The Studios altered their "release windows" strategy to sell DVDs quickly and cheaply.[9]

In the late 2000s, the startup Redbox threatened this model. Redbox buys new release DVDs and rents them for $1 per day through automated kiosks.[10]

---

[5] *See* David Waterman & Sung-Choon Lee, *Time Consistency and the Distribution of Theatrical Films: An Empirical Study of the Video Window* 8, 32 (Allied Soc. Sci. Ass'ns Annual Mtg., Working Paper, Jan. 2003); Jeffrey C. Ulin, *The Business of Media Distribution: Monetizing Film, TV and Video Content in an Online World* 205 (2d ed. 2015).

[6] *See* Ulin, *The Business of Media Distribution*, *supra* n.5, at 209. Selling movies at lower prices for retail rather than rental is called "sell-through pricing." *Id.* at 3.

[7] *See* Entm't Merchs. Ass'n, *A History of Home Video and Video Game Retailing: 2000-Present*, www.entmerch.org/press-room/industry-history.html.

[8] *See DEG Year-End 2006 Home Entertainment Sales Update*, The Digital Entm't Grp. (Jan. 8, 2007), www.degonline.org/wp-content/uploads/2014/02/f_4Q06.pdf.

[9] *See* Mike Snider, *DVDs Conquer the Movie World*, USA Today (updated Oct. 18, 2002), www.usatoday30.usatoday.com/tech/techreviews/products/2002-10-17-dvd-cover_x.htm

[10] Brooks Barnes, *Movie Studios See a Threat in Growth of Redbox*, N.Y. Times (Sept. 6, 2009), www.nytimes.com/2009/09/07/business/media/07redbox.html.

Redbox grew quickly.[11] It undermined the Studios' profits because consumers had less incentive to purchase DVDs when they could rent new releases inexpensively.[12] In 2009, multiple Studios refused to sell *any* DVDs to Redbox until 28 days after their initial release.[13] Only after Redbox sued them for copyright misuse and antitrust violations[14] did the Studios agree to work with Redbox.[15]

*Video on Demand ("VOD" or "Streaming").* About then, movie streaming became viable.[16] Streaming transformed the entertainment landscape again. Americans now spend more on streaming video than on physical discs, and DVD

---

[11] Redbox passed 100 million total rentals in February 2008, and it passed 1 billion rentals in September 2010. *See Redbox Surpasses 100 Million DVD Rentals*, Kiosk Marketplace (Jan. 31, 2008), www.kioskmarketplace.com/news/redbox-surpasses-100-million-dvd-rentals-2/; Press Release, *Three Cheers! America Rents 3 Billionth Redbox Disc*, Redbox (July 30, 2013), www.redbox.com/release_20130730.

[12] *See* Chuck Tryon, *Redbox vs. Red Envelope, Or What Happens When The Infinite Aisle Swings Through The Grocery Store*, 20 Canadian J. of Film Stud. 38, 41 (2011).

[13] *See supra* n.10.

[14] *See, e.g.*, *Redbox Automated Retail LLC v. Universal City Studios LLLP*, No. 08-cv-766, 2009 WL 2588748 (D. Del. Aug. 17, 2009).

[15] Richard Cooper, *Studios Settle Dispute with Redbox*, IHS Markit (May 12, 2010), https://technology.ihs.com/402736/studios-settle-dispute-with-redbox.

[16] Amazon launched a streaming service in 2006; Netflix introduced its streaming service in 2007, and Hulu began streaming in 2008. *See generally* Entm't Merchs. Ass'n, *A History of Home Video and Video Game Retailing: 2000-Present*, www.entmerch.org/press-room/industry-history.html.

7

drives are becoming obsolete.[17] Responding to the growth of streaming, the Studios again modified their "release windows" strategy.[18]

## B. Studio Efforts To Thwart Home Movie Filtering

Technological innovations that allow Americans to filter mature content from lawfully purchased or rented movies at home have likewise enriched the Studios by increasing the market for their works. Yet the Studios have sought to destroy every filtering company.

Various companies emerged in the late 1990s to meet a market demand for "E-rated" home movies.[19] Some bought DVDs, physically removed mature content, and resold them.[20] One company (ClearPlay, Inc.) made a specialized

---

[17] *See, e.g.*, ER317-18.

[18] *See* Nelson Granados, *Changes To Hollywood Release Windows Are Coming Fast And Furious*, Forbes (Apr. 8, 2015), www.forbes.com/sites/nelson granados/2015/04/08/changes-to-hollywood-release-windows-are-coming-fast-and-furious/#2fd562d05e5f; Matt Schruers, *The Public Costs of Private Distribution Strategies: Content Release Windows As Negative Externalities*, Project Disco (June 2, 2015), www.project-disco.org/intellectual-property/06 0215-the-public-costs-of-private-distribution-strategies-content-release-wind ows-as-negative-externalities/#.WGrbrFUrKUk.

[19] *See* Press Release, *DGA Responds and Counterclaims Against Robert Huntsman and Clean Flicks; Adds Motion Picture Studios to Suit*, Directors Guild of America (Sept. 20, 2002), www.dga.org/News/PressReleases/2002/ 0920-DGA-Responds-and-Counterclaims-Against-Robert-Huntsman-and-CleanFlicks.aspx; Michael Cornick, *Modern Film Censorship: Television, Airlines, and Home Entertainment* 5 (2008).

[20] *See* John McLaughlin, Episode of the McLaughlin Group (Sept. 27, 2002), transcript available at www.mclaughlin.com/transcript.htm?id=317.

DVD player that enabled customers to skip objectionable content.[21] By the early 2000s, each was embroiled in litigation with Hollywood. For example, the Directors Guild of America ("DGA") and the Studios alleged that ClearPlay violated the Copyright Act by permitting home filtering.[22]

Hollywood made clear that it was vehemently opposed to filtering, claiming that the practice illegally infringed upon their rights. In particular, the Studios and DGA argued that filtering performed without the approval of the director undermined the film's artistic integrity by "interfer[ing] with the story a director is trying to tell."[23]

Despite Hollywood's pervasive campaign against filtering, the litigation with ClearPlay and its peers led to public outcry. Congress held hearings and enacted the Family Movie Act of 2005 ("FMA"). As explained below, the FMA expressly protects filtering devices like the ClearPlay box as well as filtered streaming.

In the 12 years since Congress passed the FMA, the ClearPlay box has marginally survived, with few customers and substantial technical challenges. That

---

[21] *See* H.R. Rep. No. 109-33, pt. 1, at 70 (2005).

[22] *Huntsman v. Soderbergh*, No. 02-cv-01662, 2005 WL 1993421 (D. Colo. Aug. 17, 2005).

[23] *Derivative Rights, Moral Rights, and Movie Filtering Technology: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Prop. of the H. Comm. on the Judiciary*, 108th Cong. 122 (2004) (statement of Taylor Hackford, on behalf of the DGA).

is unsurprising because most Americans now prefer to stream movies instead of playing DVDs. *See, e.g.*, ER317-18. Until recently, there was no meaningful way to watch filtered streamed content ██████████████████████ ██████████████ ER711-12. Indeed, the Studios' current agreement with the DGA prohibits the Studios from doing so.[24]

Enter VidAngel.

## C. The Founding And Growth Of VidAngel

VidAngel founder and CEO Neal Harmon was raised in a religious home in which movies featuring nudity, excessive violence, or profanity were not shown. ER521-22. Unable to watch most popular entertainment, Harmon and his siblings grew up feeling excluded from American culture and from their peers. *Id.* When they became parents, they created VidAngel to give their children the social experience they missed without sacrificing their convictions. ER523-25.

Before launching VidAngel's current service, Harmon tried two other models, but the Studios withheld permission each time. One worked with Google's Chromecast device, ER524-25, but at the request of the Studios, Google (which

---

[24] *See* ER313. Section 7-509 of the DGA Agreement is entitled "Editing Theatrical Motion Pictures," and prohibits most alterations to a motion picture without the approval of the director. ER313. The agreement also reflects the actual practice of the Studios. For example, Lionsgate Entertainment, Inc. advised VidAngel that it could not license VidAngel to stream filtered movies unless VidAngel obtained permission from the DGA. ER313.

owns YouTube) removed the technology that allowed filtering on Chromecast. ER526. YouTube also notified VidAngel that it was violating YouTube's terms of service. ER527. VidAngel then briefly gave filtering away for free, which customers could watch via the YouTube Player in a computer's Chrome browser. ER527. This approach worked only for standard, not HD, content. ER527. Google then reached out to VidAngel to explore a filtering feature that would work for all content on Google Play. ER527. But that partnership too required Studio sign-off, and they again refused. ER527.

Faced with this intransigence, VidAngel developed its current business. For each title it offers, VidAngel buys multiple, legally authorized copies of the movie on DVD or Blu-ray disc. ER292, 533-34. It copies and processes the movie file(s) from one disc so they can be tagged for inappropriate content and uploads them to cloud storage. E487-88. This entails breaking the movie into tiny segments and tagging each segment for over 80 categories of content, including nudity, profanity, drug use, sex, and violence. ER318, 486-87. The tagged segments are encrypted and stored in the cloud. ER487.

VidAngel purchases *many* authorized DVDs or Blu-ray discs of each title. *See, e.g.*, ER292 ("VidAngel spends one third of all capital raised to lawfully purchase thousands of DVD and Blu-ray discs * * * ."); ER674-87 (VidAngel

11

already spent $1.2 million buying DVDs as of September 2016). It enters each disc into an inventory database and assigns each a unique barcode. ER487.

VidAngel's customers can watch filtered movies, including HD content, on their favorite mobile devices and set-top boxes using apps that VidAngel developed for Roku, Apple TV, Amazon Fire, Android TV, Kindle Fire, and Google Play. ER532-34. To watch a filtered movie, a VidAngel customer purchases a *specific* physical disc from VidAngel's inventory. ER489. If VidAngel does not have a disc in stock, it informs the customer that that title is "out of stock" and the movie is unavailable. ER541 (VidAngel sent nearly 60,000 unique customers over 250,000 "out of stock" notices in August 2016).

The customer must select at least one filter, and customers who filter out the credits (which may contain offensive blooper reels) must choose at least one additional filter. ER532-34. Approximately 96% of VidAngel customers request multiple filters; typically, language and sex. ER536. VidAngel streams only those segments that meet the customer's preferences. *See* ER486-87, 489. No copy of the individualized, filtered movie exists in fixed form. ER489 (VidAngel discards the segments).

VidAngel encourages its customers to sell their discs back. Those who do so receive store credit equal to the purchase price of their disc less $1 per day for each

12

day of ownership. ER536. Customers who sell their discs back pay VidAngel around what they would pay Redbox for the same title. ER529, 536; *supra* n.10.

In July and August 2015, VidAngel wrote to the Studios and described its business model in detail. ER529-30, 547-50. Its letters disclosed that VidAngel had grown from 43 to 4,848 users in under six months, asked to work with the Studios, and invited them to access VidAngel and inquire about its technology and business. ER547-50. VidAngel specifically asked: "If you disagree with VidAngel's belief that its technology fully complies with the Copyright Act or otherwise does not adequately protect the rights of copyright owners, please let us know." ER550. No Studio responded substantively.

Instead, the Studios opened a VidAngel account and prepared for litigation.[25] During the many months the Studios waited silently before filing suit, VidAngel officially opened to the public, spent millions of dollars to acquire discs, raised millions in additional funding, hired employees, and undertook monumental efforts to improve its service and develop apps for every major mobile application store and set-top box. ER532-34.

---

[25] Plaintiff Disney Enterprises opened a VidAngel account on August 6, 2015. ER529-30, 551-53. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ER724-25.

13

## D. This Litigation

Eleven months after learning of VidAngel's model, the Studios filed this two-count lawsuit on June 19, 2016. Both counts allege violations of the Copyright Act. ER629-31. On July 12, 2016, VidAngel counterclaimed for, *inter alia*, antitrust and tort violations. ER331-34.

Two months after filing suit, on August 22, 2016, the Studios filed a preliminary injunction motion and noticed a hearing for October 24, 2016. ER568. By the parties' agreement, and later on the court's own motion, the hearing date was moved, ultimately to November 14, 2016. ER218, 288, 652.

On December 12, 2016 the court entered an order granting a preliminary injunction. ER1. After the Studios posted bond, ER75, VidAngel endeavored to find a technological solution that would allow it to remove only the Studios' titles from its servers, but was unable to do so. ER28. On December 29, 2016, VidAngel completely shut down its movie-streaming service. ER28.[26] VidAngel timely appealed. Both the district court and this Court denied VidAngel's requests for a stay pending appeal. ER24, 29.

---

[26] Despite VidAngel's complete shutdown of its movie-streaming servers on December 29, 2016, the district court (on January 6, 2017) found VidAngel—for not complying faster—in contempt and ordered VidAngel to pay the Studios $10,231.20 in attorneys' fees. ER23.

## STANDARD OF REVIEW

A preliminary injunction is reviewed for abuse of discretion. *See Brookfield Commc'ns v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999). Reversal is appropriate if the district court based its decision on clearly erroneous findings of fact or erroneous legal principles. *Id.* at 1046.

## SUMMARY OF ARGUMENT

VidAngel's filtering business is specifically protected by the FMA and not otherwise illegal or unfair.

First, the district court erred in finding that the Studios are likely to win their reproduction and public performance claims. The FMA authorizes filtering that satisfies certain conditions, and VidAngel does so. All filtering begins with and thus comes "from an authorized copy," and no "fixed copy" of the filtered movie is ever created. Nor does VidAngel engage in a "public performance": rather, it streams individualized content to its particular lawful owner at her direction.

Second, the district court incorrectly found that the Studios were likely to succeed on their access control circumvention claim. There is no dispute that VidAngel and its customers are authorized to access movies to view them. What the Studios really object to is a decryption method that allows VidAngel to copy, filter, and stream—i.e., unauthorized *use*—but the Digital Millennium Copyright Act ("DMCA") expressly does not penalize unauthorized *use*. *Compare* 17 U.S.C.

15

§ 1201(a) (prohibiting unauthorized access) *with* 17 U.S.C. § 1201(b) (permitting unauthorized use). The Studios' broad reading of section 1201(a) would effectively give them unilateral authority to prevent *non-infringing* uses of their content. That is not what Congress intended in enacting the Copyright Act or the DMCA, and it would impermissibly render the FMA a dead letter.

VidAngel will also prevail on an alternative fair use defense to both the copyright and circumvention claims. Buying a disc at the price set by the Studios, filtering it at the direction of its owner, and streaming that content is classic space-shifting fair use. This practice also benefits the Studios by broadening their audience, as has every other previous transformative home entertainment technology.

Nor do the equities favor the Studios. They presented no evidence of any harm below, let alone irreparable harm. VidAngel, in contrast, was forced to shut down to comply with the district court's order. As a result—despite Congress's wishes—millions of American families have no viable filtering option.

The injunction should be dissolved.

## ARGUMENT

**I. The District Court Abused Its Discretion In Finding The Studios Demonstrated Likelihood Of Success On Their First Cause Of Action: Copyright Infringement Under 17 U.S.C. § 106.**

The Studios maintain that VidAngel (i) violates their reproduction rights under 17 U.S.C. § 106(1) by making intermediate copies of each movie as part of its filtering process and (ii) violates their public performance rights under 17 U.S.C. § 106(4) by streaming a filtered movie to its customers. ER594-99.

The district court agreed. ER9-11. That was error. The FMA expressly immunizes VidAngel from any liability under section 106. And VidAngel is likely to prevail on its alternative fair use defense.

### A. The FMA Authorizes Filtering That Satisfies Certain Conditions.

The Studios obscure the point and plain command of the FMA by deriding VidAngel's business model as illicit. In the first paragraph of their Complaint (and every subsequent brief), they insist VidAngel is a pirate that does not pay for what it does. *See, e.g.*, ER614 ("VidAngel charges users for watching that content but has no authorization *and pays nothing for the rights it exploits.*") (emphasis added). That is demonstrably false.

VidAngel spends millions of dollars buying the Studios' discs. ER674-75. It then sells those physical discs to its customers. ER509-10. Only customers who own a specific, physical disc of a given movie can get a stream from VidAngel.

17

ER510. Nothing about that is unfair. The Studios are paid handsomely both in total dollars *and* as a percentage of the total revenues collected by VidAngel.[27] To be clear: the Studios have been paid.

The Studios know this. So they attack VidAngel's model as a "sham," arguing that VidAngel's customers aren't owners because most sell the discs back to VidAngel after seeing the movie. That is neither accurate nor material.

First, the Studios' characterization of VidAngel as a rental business is simply wrong. If you purchase something with the intent to resell it, that does not mean you are not its owner. And 20% of VidAngel's discs are *never sold back.* ER99.

Second, the Studios' characterization is irrelevant. VidAngel could legally rent each physical disc as many times as it wants. (That's what Redbox does.) And lawful possessors of a disc—whether owners *or renters*—can watch the movie how often they want, and how they want. No one disputes that a renter can fast-forward through objectionable parts of a movie. There is therefore no reason she cannot ask VidAngel to do it for her.

---

[27] *See, e.g.,* ER683 ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ER683 (noting that "Google Play and VUDU VOD Distribution Agreements with Sony calls for Sony to receive 70% of the revenue day one, and receive 65% for the four weeks thereafter for all new release rentals.").

18

VidAngel's model is perfectly legitimate and a natural descendant of the approach used by companies like Blockbuster and Redbox. Moreover, the FMA was expressly written to protect legitimate filtering businesses like VidAngel. And the Studios get paid millions.

The FMA is codified, in pertinent part, at 17 U.S.C. § 110(11) and is part of the Copyright Act. Conduct that satisfies its conditions is afforded a complete defense to all claims under 17 U.S.C. § 106. The relevant text provides:

> *Notwithstanding the provisions of section 106, the following are not infringements of copyright*: * * * the making imperceptible, by or at the direction of a member of a private household, of limited portions of audio or video content of a motion picture, during a performance in or transmitted to that household for private home viewing, from an authorized copy of the motion picture, or the creation or provision of a computer program or other technology that enables such making imperceptible and that is designed and marketed to be used, at the direction of a member of a private household, for such making imperceptible, if no fixed copy of the altered version of the motion picture is created by such computer program or other technology.

17 U.S.C. § 110(11) (emphasis added).

The *raison d'être* of the FMA is to ensure that families who lawfully purchase or rent movies can filter them for viewing in their homes without violating the Copyright Act.[28] The FMA specifically immunizes technology

---

[28] The FMA was designed to "immunize[] from copyright and trademark liability any for-profit companies that develop movie-editing software" to sanitize "undesired content," 150 Cong. Rec. H7659 (daily ed. Sept. 28, 2004) (statement of Rep. Jackson-Lee), and to "ensure" that technology that helps parents

19

(whether known or later developed) that enables such filtering.[29] All of this is clear

from the text of the Act itself:

- As a starting point, the Act defines filtering: "the making imperceptible * * * of limited portions * * * of a motion picture."

- Second, to be non-infringing, filtering must be individualized and private, viz., the filtering must be done "at the direction of a member of a private household," and "transmitted for private home viewing."

- Third, the FMA couples the right to home filtering with the right to build and use technology to effectuate it. Specifically, the FMA expressly authorizes the use of "a computer program or other technology that *enables*" home filtering (emphasis added), provided that technology does not create "[a] fixed copy of the altered version of the motion picture."

- Fourth, one cannot filter a bootlegged copy of a movie and claim immunity from infringement; the filtering must come "from an authorized copy" of the movie.

Filtering that satisfies the above conditions is, by command of Congress, non-

infringing. As a result, neither the Studios' reproduction nor public performance

infringement claims can prevail.

## B.    VidAngel's Filtering Satisfies The FMA's Conditions.

The facts of VidAngel's service are not in dispute. VidAngel lawfully buys a

disc of a given title, decrypts the disc and copies the movie, breaks the movie into

many segments, and then "tags" each segment for over 80 categories of

---

"determine what their children see on the screen" would "not face continued legal challenges." *Id.* (statement of Rep. Smith).

[29] The Copyright Act defines performance to include the playing "either directly or by means of any device or process * * * ." 17 U.S.C. § 101. It defines a "device" or "process" as "one now known or later developed." *Id.*

objectionable content. VidAngel "reassembles" a title only when a customer chooses which objectionable content to filter, after which VidAngel transmits the non-filtered segments to the consumer's home for private viewing. The district court erred in concluding that the foregoing conduct infringes the Studios' reproduction and public performance rights.

### 1. The reproduction claim is unlikely to succeed.

Regarding reproduction, the district court reasoned that VidAngel—in copying the movie from a disc as the first step in its filtering process—creates a "copy" of the movie in violation of section 106(1). ER9-10. It then mistakenly held that the FMA does not excuse such conduct because "[t]he digital content that VidAngel streams to its customers is not from an authorized copy." ER12.

The district court did not dispute that VidAngel *begins* its filtering process with an authorized copy of the title, i.e., a disc acquired on the open market. Instead, it took issue with a *step* in VidAngel's filtering process, namely, copying the movie from the disc. It viewed that step as creating an unauthorized copy outside the FMA's safe harbor and reasoned that any subsequent filtered stream sent by VidAngel could not be "from an authorized copy," as the statute requires. That conclusion was erroneous for three reasons.

First, a common sense reading of the statute supports VidAngel. Buying an authorized disc and processing it into tiny segments tagged for mature content that

21

may be reassembled only by filtering customers is most naturally described as providing filtering "from an authorized copy." Holiday cards are best described as coming from loved ones, even though the mailman serves as an intermediary. Only a hypertechnical interpretation would insist the card came from the mailman.

Second, Congress carefully crafted the FMA's protections to avoid turning on the technical details of any given filtering technology. The statute authorizes not merely "the creation or provision of a computer program," but also, broadly, "or *other technology* that *enables*" filtering, 17 U.S.C. § 110(11) (emphasis added), thereby making clear Congress's intent to dispense with battles over intermediate steps. Instead, Congress focused on the *initial* step of filtering, i.e., it must begin with an authorized copy, and the *final* step of filtering, i.e., it cannot result in a fixed copy of a consumer's altered version of the movie. If one begins with an authorized copy of a title, and displays the filtered movie only to consumer-owners of that title, in the most natural construction of the phrase, VidAngel's technology *enables* filtering from (and with respect to) an authorized copy.

Third, VidAngel offers the only interpretation consistent with the purpose of the FMA. The Studios long insisted that only *they* had the power to authorize filtering of their movies. Congress specifically disagreed, deciding that families should have the power to filter in their own homes. In granting filtering power to

consumers, Congress could not have intended to preclude technological solutions that entail transient, intermediate copies.

### 2. The public performance claim is unlikely to succeed.

At the Studios' urging, the district court also concluded that VidAngel engages in a "public performance" of protected works. ER10-11. Its conclusion that VidAngel publicly performs was mistaken. As an initial matter, VidAngel does not engage in any "performance."[30] But even if it did, the FMA is a complete defense. As explained above, VidAngel's service results in precisely what the FMA specifically sanctions, i.e., a "performance * * * transmitted * * * for private home viewing."

Even under a traditional analysis, VidAngel does not stream to the public. It streams only to customers who have purchased a disc and therefore have paid for the right to view its content an unlimited number of times in the privacy of their homes. For purposes of section 106(4), that distinction is critical.

---

[30] It is VidAngel's customers (not VidAngel) who transmit and therefore perform. VidAngel streams *only* at the customer's direction, and *only* what the customer elects not to filter out. *Cf. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1020 (9th Cir. 2013); *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131-33 (2d Cir. 2008); *Costar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004); *Columbia Pictures Indus., Inc. v. Aveco, Inc.*, 800 F.2d 59, 62 (3d Cir. 1986). *American Broadcasting Cos. v. Aereo* did not abolish the volition requirement. 134 S. Ct. 2498 (2014) ("*Aereo*"). Unlike *Aereo*, VidAngel's customers purchase a disc and request streaming of the content in a manner tailored to their individual preferences.

Persons who have legally obtained the right to possess and view the relevant content are not members of "the public" under section 106(4). The Supreme Court was unequivocal about this: "We have said that [the term public] does not extend to those who act as owners or possessors of the relevant product." *Aereo*, 134 S. Ct. at 2510-11.[31]

That makes sense. One who has the right to view a disc can arrange to do so in her own home. Nothing about transmitting the disc's content to that person is "public" in law or logic. Indeed, two of the Studios (Disney and Fox) granted this precise point in *Aereo*. *See* Brief for Petitioners at *46, *Aereo*, 134 S. Ct. 2498 (2014) (No. 13-461), 2014 WL 768315 ("There is an obvious difference between a service that merely stores and provides an individual user access to copies of copyrighted content that the user already has legally obtained, and a service that offers the copyrighted content itself to the public at large.").

The district court nonetheless concluded that VidAngel's customers own only the disc, not the right to have that content streamed, and therefore are

---

[31] *See also Fox Broad. Co. v. Dish Network LLC*, 160 F. Supp. 3d 1139, 1162 (C.D. Cal. 2015) (evaluating service in which "subscriber transmits programming *rightfully in her possession* to another device," and concluding that "[t]his is simply not a 'public' performance within the meaning of the Transmit Clause" (emphasis in original)); *United States v. ASCAP*, 627 F.3d 64, 73 (2d Cir. 2010) (noting that "when Congress speaks of transmitting a performance to the public, it refers to the performance created by the act of transmission * * * " (citation omitted)).

members of the public with respect to receiving a stream. ER10-11 (adopting the Studios' argument). That both misses the point of what the Supreme Court and the Studios said in *Aereo* regarding who the public is (and isn't) and how VidAngel's service works. VidAngel streams a filtered movie that (1) is available only to customers who own a disc—and thus have a right to play at their leisure the movie in question, and (2) is available only to disc owners pursuant to their *personalized* filtering choices (i.e., each stream is unique). *Cf. Cartoon Network*, 536 F.3d at 139 (holding that "transmission * * * made to a single subscriber using a single unique copy produced by that subscriber" is not a public performance).

Because VidAngel's service is available only to those who lawfully purchase discs, the filtering it offers is not only private, but profoundly limited. Millions of families are interested in filtering. But because discs are costly for VidAngel to buy and not unlimited in number, VidAngel can offer filtering only to a small subset of its potential customer base. VidAngel's model not only ensures that the Studios are compensated for the discs *they elected to sell*, it makes it impossible for VidAngel to offer streaming to the public at large.

And that is the irony of this case. VidAngel would *prefer* to receive a license from the Studios to stream filtered content to the public. ER540-41.[32] But the Studios oppose filtering and have refused to deal. VidAngel thus had no choice but

---

[32] Indeed, as discs become obsolete, so will VidAngel's business. ER444-45.

25

to resort to its disc-based model, which limits it to streaming filtered content based upon the availability of a disc to purchase and resell. A disc for which the Studios got paid.

One final point. That VidAngel does not stream from the physical disc it sells to the customer is irrelevant for public performance purposes. As Disney and Fox assured the Supreme Court: "the transmit clause says not a word about whether transmissions originate from a single copy of a performance * * * ." Brief for Petitioners at *36, Aereo, 134 S. Ct. 2498 (2014) (No. 13-461), 2014 WL 768315. What matters is not the physical medium from which the content originates, but the capacity in which the recipient receives it. Unlike the rest of the non-owner "public," an owner may watch a title an unlimited number of times, whether by putting a disc in a home device or by transmission to her home.[33] The opposite result, which the district court reached, is both hypertechnical and inconsistent with Aereo's guidance.

### C.  VidAngel's Service Is Also A Protected Fair Use.

The district court's rejection of VidAngel's fair use defense was also error. See ER13-16. The fair use doctrine permits otherwise infringing uses that society

---

[33] See Brief of the United States as Amicus Curiae Supporting Petitioners at *32, Aereo, 134 S. Ct. 2498 (2013) (No.13-461), 2014 WL 828079 ("Ordinarily * * * a consumer's streaming of her own lawfully acquired copy to herself would effect a private performance outside the scope of the Transmit Clause.").

prefers to allow. As the Supreme Court memorably put it, fair use is an "equitable rule of reason * * * which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 236 (1990).

What VidAngel does is fair under the FMA and under generally recognized concepts in fair use jurisprudence. VidAngel creates an intermediate copy for precisely one reason: so that it can send filtered streams to its customers' homes. Making intermediate copies to further the ultimate public good and purpose of the Copyright Act has long been recognized as classic fair use. *See, e.g.*, *Sega Enters. Ltd. v. Accolade Inc.*, 977 F.2d 1510 (9th Cir. 1992), *as amended* (Jan. 6, 1993); *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602-08 (9th Cir. 2000). And here the ultimate non-infringing use—viewing a filtered movie at home—is one Congress specifically sanctioned.

Streaming individually filtered versions of movies to customers *after* they have purchased a disc copy of the movie does not differ meaningfully from what this Court has called a paradigmatic example of fair use: space-shifting. *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999). Space-shifting refers to the idea that a consumer who buys content has the equitable right to watch it across platforms. Because a customer who buys a disc of a movie clearly has the right to watch it, fair use permits her to upload that

27

movie to cloud storage and watch it via a stream. She is not limited to watching the movie solely from the disc. Such space-shifting, as the content providers have themselves told the Supreme Court, is perfectly legal. Transcript of Oral Argument at 12, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) (No. 04-480) ("The record companies, my clients, have said, for some time now * * * that it's perfectly lawful to take a CD that you've purchased, upload it onto your computer, put it on your iPod.").

VidAngel facilitates permissible space-shifting with a congressionally approved twist. Using the Internet, a customer instructs VidAngel to create and transmit a filtered stream of a movie that the customer, by virtue of her disc ownership, is already entitled to view. That is space-shifting. The only difference is that the streamed content is filtered. But that does not make the use unfair. To the contrary, transmitting a filtered stream to a household that owned the movie is exactly what Congress intended.

The individual fair use factors support the same conclusion. True, VidAngel is a commercial enterprise; it filters creative, fictional works, and it uses a substantial portion of those works. These factors may perhaps weigh slightly against a finding of fair use.[34] But that was also true for the VCR, and for many

---

[34] *But see Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820-21 (9th Cir. 2002) (in analogous setting, these factors neither "weigh[] for nor against either party * * * .")

other protected fair uses as well.[35] And here they are easily outweighed by two other factors.

First, what VidAngel does is profoundly transformative, which weighs heavily in favor of fair use. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 570 (1994) (explaining that "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."). The district court deemed VidAngel's filtering not transformative because it "does not add anything to Plaintiff's works * * * [i]t simply omits portions that viewers find objectionable." ER14. That conclusion is both inaccurate and wrongly dismissive of the interest the FMA was enacted to vindicate.

To state the obvious: omissions can transform a work. Romeo and Juliet absent the final act is not a tragedy, and the Bible reads quite differently with no resurrection of Jesus. Nor is the transformative power of omission limited to plot. Removal of mature content has such a powerful transformative effect that only then will certain audiences watch those movies. Religious convictions, and parental views about what is appropriate for children, are real and powerful and in fact matter more to VidAngel's customers than *anything else* about a particular

---

[35] *See, e.g.*, *Kelly*, 336 F.3d at 815-21 (commercial use of thumbnails that depicted entire content of copyrighted pictures was protected). Indeed, to equate commercial use with unfair use would effectively destroy the doctrine.

title. Congress patently agreed, determining that "simply omit[ting] portions [of copyrighted works] that viewers find objectionable" was significant enough to warrant express Congressional protection. The Studios resisted mightily precisely because they claimed the exclusive right to make editorial choices. H.R. Rep. No. 109-33, pt. 1, at 69 (2005). Those choices matter *because* omissions can clearly transform a work.[36]

Nor does VidAngel's transformative filtering undermine the value of or market for the Studios' works. VidAngel is no pirate. Like Redbox and Blockbuster before it, VidAngel spends millions of dollars to buy discs the Studios have chosen to sell, directly profiting the Studios. Moreover, the evidence established that many American families would not watch the Studios' titles absent a convenient filtering service—which means that VidAngel benefits the Studios' bottom line by increasing their potential audience. *Cf. Sony*, 464 U.S. at 454 ("It is not implausible that benefits could also accrue to plaintiffs, broadcasters, and advertisers, as the Betamax makes it possible for more persons to view their broadcasts."). Indeed, a majority (51%) of VidAngel's customers *would not view movies without filtering*. ER536-37.

---

[36] *See, e.g., supra* n.23 (statement of Taylor Hackford, on behalf of the DGA) ("Removing scenes and dialogue from films interferes with the story a director is trying to tell, and in so doing, can take away from the narrative structure and overall vision * * * .").

There is no doubt that VidAngel's conduct would be fair use if *all* its customers refused to watch the Studios' movies without filtering. The fair use doctrine indisputably protects "a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work" since such use "need not be prohibited in order to protect the author's incentive to create." *Sony*, 464 U.S. at 449. As the district court found, that reality is true for the majority of VidAngel's customers. ER15.

That leaves a minority of customers who might indeed be forced to watch content (perhaps without their children) they do not desire because VidAngel's filtering is unavailable. ER36-37. But even for this minority, VidAngel gives the Studios the cut they are due: the Studios make the same amount from VidAngel (i.e., the purchase price of the disc) as they do from Redbox or other businesses that buy and rent these discs to customers. In short, VidAngel expands the market and pays the Studios their share. That Studios *might* make more money by selling platform-specific copies explains (partially) why we are here. But it does not entitle the Studios to relief. The Studios already got paid, and their market is only enhanced.

31

**II.     The District Court Abused Its Discretion In Finding The Studios Demonstrated Likelihood Of Success On Their Second Claim: Access Control Circumvention Under 17 U.S.C. § 1201(a).**

Because their first claim (copyright infringement) is weak, the Studios begin every submission with their second claim (DMCA circumvention). The Studios' DMCA argument is both simple and facially appealing. It is also wrong.

The DMCA differentiates between measures that control access (section 1201(a)) and measures that control use (section 1201(b)). Circumventing use-control measures is *not* actionable under the DMCA. Use-control circumvention permits a remedy *only* if the resulting use infringes copyright in violation of 17 U.S.C. § 106.[37] Declining to prohibit circumvention of use-control measures makes good sense. The alternative would allow content creators to employ use controls *to bar non-infringing uses* by lawful content owners.

Access-controls prevent viewing, not use. They are treated differently; circumventing them without the owner's authority is independently actionable. Encryption is an access control because it prevents unauthorized viewing. Yet like all disc owners, VidAngel and its customers *unquestionably have authority to decrypt* and view each movie.

---

[37] Trafficking in use-control circumvention technology is also actionable. *See* 17 U.S.C. § 1201(b).

32

The Studios insist that they only *conditionally* authorize access: decryption to view is allegedly granted, but decryption to copy, filter, and stream is allegedly not. But conditional authorization to access content depending on what you do with it is just use-control by another name. Permitting the Studios to enforce such a control through section 1201(a) would frustrate the comprehensive scheme Congress enacted for use-controls, which imposes liability only for (1) trafficking or (2) subsequently committing copyright infringement. VidAngel does neither.

The Studios' position distorts the text, history, and purpose of the DMCA. It is also irreconcilable with the FMA, enacted seven years later. If this Court nonetheless adopts the Studios' position, it must then answer a question it expressly left unresolved in *MDY Industries, LLC v. Blizzard Entertainment, Inc.*: is fair use an affirmative defense to a prima facie violation of section 1201? 629 F.3d 928, 958 n.12 (9th Cir. 2010) ("*Blizzard*"). The answer is yes. And, as explained above, VidAngel is likely to prevail on such a defense.

## A.    The DMCA Prohibits The Unauthorized Circumvention Of Access Protections, *Not* Copy Protections.

To understand why VidAngel does not violate 17 U.S.C. § 1201(a)(1)(A), it is important to understand the three circumvention prohibitions set forth in the statute. As this Court noted in 2010: "The DMCA contains three provisions directed at the circumvention of copyright owners' technological measures." *Blizzard*, 629 F.3d at 943 (describing sections 1201(a)(1)(A), (a)(2), and (b)(1)).

33

The Studios accuse VidAngel of violating only the first of the three provisions: 17 U.S.C. § 1201(a)(1)(A). *See* ER630-31.

Section 1201(a) of the DMCA concerns only the circumvention of *access* protections. *See* 17 U.S.C. § 1201(a)(3)(B) (defining the relevant phrase used throughout section 1201(a): "a technological measure [that] 'effectively controls access to a work'"). The statute prohibits the direct circumvention of access protections. *See* 17 U.S.C. § 1201(a)(1)(A). But it also makes clear that authorized conduct does not constitute such circumvention:

> [T]o "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, *without the authority of the copyright owner * * * .*

17 U.S.C. § 1201(a)(3)(A) (emphasis added). The statute also imposes liability for "trafficking" in access-circumvention devices. 17 U.S.C. § 1201(a)(2).

In contrast, section 1201(b) regulates the circumvention of *copy* (or use) protections. *See* 17 U.S.C. § 1201(b)(2)(B) (defining the relevant phrase used throughout section 1201(b): "a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof"). As this Court has expressly held, section 1201(b) does *not* prohibit direct circumvention. *Blizzard*, 629 F.3d at 945 ("§ 1201(a)(1)(A) prohibits circumventing an effective access control measure, whereas § 1201(b) * * * does not prohibit circumvention * * * because such conduct was already outlawed as copyright infringement.").

34

Instead, section 1201(b) provides a broader definition of circumvention with no exemption for authorization. *See* 17 U.S.C. § 1201(b)(2)(A). And it imposes liability *only* on those who "traffic" in copy protection circumvention devices. 17 U.S.C. § 1201(b)(1).

## B. VidAngel Does Not Circumvent Access Control Protections Because It Is Authorized By The Studios To Avoid Them.

VidAngel uses software to decrypt the protections of Content Scramble System ("CSS"), Advanced Access Content System ("AACS"), and BD+. ER474-75. But like all lawful purchasers, VidAngel is *authorized* by the Studios to decrypt CSS, AACS, and BD+ to view the discs' content (i.e., "gain access to the work"). As such, VidAngel does not circumvent an access protection in violation of section 1201(a)(1)(A).

The Studios' real objection is to the *manner* in which VidAngel avoids these protections. In essence, the Studios claim the right to grant lawful disc purchasers the authority to circumvent them *only in a specific way* that grants access but not copying. Interpreting the text of section 1201(a) in such a manner, however, ignores the structure, history, and purpose of the DMCA. *Cf. LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009) (rejecting broad construction of "without authorization" in Computer Fraud and Abuse Act); *United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012) (en banc) (same).

35

In *Blizzard*, this Court closely examined the differences between sections 1201(a) and (b) of the DMCA. 629 F.3d at 943-46. The Court determined that section 1201(a) "creates a new anticircumvention right distinct from copyright infringement." *Id.* at 948. It specifically held that "a fair reading of the statute (supported by legislative history) indicates that Congress created a distinct anti-circumvention right under § 1201(a) without an infringement nexus requirement." *Id.* at 952.[38]

In rejecting a section 1201(a) infringement nexus requirement, the *Blizzard* Court saw a distinct (and extremely narrow) Congressional purpose in section 1201(a) evidenced by legislative history. It noted that:

- "[T]he Senate Judiciary Committee report explains that 1201(a)(2) and (b)(1) are 'not interchangeable': they were 'designed to protect two distinct rights and to target two distinct classes of devices' * * * ." *Id.* at 947 (quoting S. Rep. No. 105-190, at 12 (1998)).

- "The House Judiciary Committee similarly states of 1201(a)(2), 'The act of circumventing a technological protection measure put in place by a copyright owner to control access to a copyrighted work is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book." *Id.* at 947 (quoting H.R. Rep. No. 105-551, pt. 1, at 17 (1998)).

---

[38] In so doing, this Court created and acknowledged a circuit split with the Federal Circuit. *Blizzard*, 629 F.3d at 948. In the Federal Circuit, the Studios' failure to prevail on their copyright claim would necessarily doom their DMCA claim. If this Court concludes that the Studios are unlikely to prevail on their copyright claim but likely to prevail on their DMCA claim, VidAngel reserves the right to seek en banc review of the infringement nexus question.

Indeed, this Court relied on the House Commerce Committee's explanation of how such a locked room analogy applies in a digital world:

> [An] increasing number of intellectual property works are being distributed using a 'client-server' model, where the work is effectively 'borrowed' by the user (e.g., infrequent users of expensive software purchase a certain number of uses, or viewers watch a movie on a pay-per-view basis).

*Id*. at 947-48 (quoting H.R. Rep. No. 105-551, pt. 2, at 23 (1998)).

Unlike a customer who pays for a single viewing of the movie (and then circumvents CSS, AACS, or BD+ to watch another time), VidAngel's decryption is not akin to breaking into a locked room to obtain a copy of a book. It is akin to being given a key to a locked room and told to use the key only if you agree not to photograph or take anything. Imagine that you use the key, find your property inside, and photograph it. Whether or not your decision to photograph was wrongful, it makes little sense to punish you for entering the room.

In passing the DMCA, Congress did not speak to every technological measure that might eventually emerge. It created distinct rights in sections 1201(a) and (b) without expressly addressing that a given technology might not fall clearly into one category or the other. As later noted by the Librarian of Congress:

> Congress did create a distinction between the conduct of circumvention of access controls and the conduct of circumvention of use controls by prohibiting the former while permitting the latter, but neither the language of section 1201 nor the legislative history addresses the possibility of access controls that also restrict use. It is unclear how a court might address this issue. It would be helpful if

37

Congress were to clarify its intent, since the implementation of merged technological measures arguably would undermine Congress's decision to offer disparate treatment for access and use controls in section 1201.

65 Fed. Reg. 64568 (Oct. 27, 2000).

Congress has not taken up this suggestion to clarify the law. But the proper answer is clear. If the lawful purchaser of a digital work is authorized by the copyright holder to circumvent encryption to view (without restriction) a complete work, any attempt to condition that authority on a method of decryption that prevents copying is properly understood as a use (not access) control. If there is a subsequent copyright violation (i.e., unlawful copying), then 17 U.S.C. § 106 provides the clear and satisfactory remedy. If there is no subsequent copyright violation, the Studios will not (and should not) have any remedy under the Copyright Act.

If the Studios' contrary view were accepted, copyright owners could—and likely will—prohibit lawful owners of copyrighted materials from engaging in a wide range of lawful uses by employing measures that simultaneously protect access and use. That is not and should not be the law.

## C.    VidAngel Offers The Only Reading Of Section 1201(a) That Can Be Reconciled With The FMA, A Later-Enacted Statute.

Congress enacted the FMA because it wanted filtering, including filtering over the Internet, to be legal despite the Studios' objections.[39] Yet the Studios claim that filtered streaming requires their permission. That cannot be right.

For any movie to be filtered, transmitted, and viewed over the Internet, the following three things must happen: (1) one must have access to a decrypted copy of the work; (2) one must stream the work or derivatives thereof over the Internet; and (3) a filtering technology must be applied before displaying the work to the end-user. As a matter of logic and physics, there is no successful transmission scenario in which those three things do not happen.

Because the Studios encrypt all the content they produce, their reading of section 1201(a) gives them an ironclad veto over step one of *any transmission*. Like the district court, the Studios view the authorization of access to an encrypted work as conditional; authorization to decrypt a movie to view it (which every disc owner necessarily has and does) is allegedly not the same as authorization to decrypt a movie to stream it. On their account, their power goes even further: customers of services (like Google Play) that *do* obtain authorization to decrypt

---

[39] *Family Movie Act of 2004: Hearing on H.R. 4586 Before the Subcomm. on Courts, the Internet, Intellectual Property of the H. Comm. on the Judiciary*, 108th Cong. 68 (2004); H.R. Rep. No. 109-33, pt. 1, at 70 (2005).

and stream movies can be subjected to terms of use. The Studios can thus always contractually demand that streaming companies make filtering or modifying streamed content a violation of the terms of service.

In the Studios' view, the FMA only trimmed *copyrights*, not other rights, and specifically not the access-control rights under section 1201(a) that they construe expansively. According to the Studios, any filtering that infringes upon *those* expansive rights is still verboten. Thus, filtering over the Internet can occur only with their blessing.

That argument both ignores the history of the FMA and impugns Congress as a spectacularly impotent body given to nullifying its own objectives. *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (Learned Hand explaining that "it is one of the surest indexes of a mature and developed jurisprudence * * * to remember that statutes always have some purpose or object to accomplish.").

The point of the FMA was to permit filtering. As initially proposed, the FMA addressed only filtering movies "performed in" private households, i.e., filtering movies played on DVD players in the home. Family Movie Act of 2004, H.R. Rep. No. 4586, 108th Cong. § 2 (2004) (containing no transmission language). But the bill's language was modified to reach "performances * * * transmitted" to private households, which, by definition, includes performances transmitted over the Internet. Family Entertainment and

40

Copyright Act of 2005, Pub. L. No. 109-9, § 167, 119 Stat. 218, 223 (2005); *see also* ER286. If the Studios are right, adding the transmission language to the FMA accomplished *literally nothing*.

The Studios attempt to justify that position through a distortion of legislative history. Specifically, they rely on the Senate report summarizing the FMA. *See* 151 Cong. Rec. S450, S501-02 (daily ed. Jan 25, 2005) (statement of Sen. Hatch). The language in that Report facially most favorable to the Studios—indeed, it is essentially their whole case—is a mention that "the Act does not provide any exemption from the anti-circumvention provisions of section 1201 * * * ." *Id.* at S502.

That paragraph, however, is entirely consistent with VidAngel's position. As explained above, because VidAngel is authorized to decrypt to view a movie, it circumvents no access control. That reading of authorization is compatible with the text of the DMCA, and preserves the force of the word "transmitted" in the FMA. Nothing in the text or legislative history of the FMA rejects that reading of the DMCA. As such, there would simply be no reason for the FMA to provide an "exemption from the anti-circumvention provisions of section 1201."

The Studios conveniently omit other legislative history from the House Subcommittee where the FMA was introduced and hotly debated—history that

41

undermines their reading of section 1201. For example, Congresswoman Lofgren asked Mr. Aho (then CEO of ClearPlay):

> So you don't have to defeat the encryption that is protecting these DVDs, for example, although I guess theoretically the movie industry could go to the next phase of encryption, which would then require you to defeat that scheme.

*Supra* n.23 at 73. When Mr. Aho demurred, Congresswoman Lofgren's response made clear that she shared VidAngel's understanding of 1201(a):

> All right. Okay. You know, I am interested in this. * * * But I really think there's a broader issue here, which is artists are free to create and express, but consumers who lawfully purchase or rent are not required to look at all of it. * * * And it seems to me that once you've lawfully purchased something, you have a right to watch some of it, all of it. It's your choice. And if you use technology to assist you in making that choice, it's still fundamentally your choice on what to see.

*Id.* at 74. Her point was that the right to filter was not prey to development of some system of access-control that could render filtering technically impossible. Yet that is precisely what the Studios ask this Court to bless.

At the end of the day, this exercise illustrates why courts interpret and apply statutory text, not legislative history. Only the statutory text was passed by both houses of Congress and signed by the President. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 253 (2010) (Scalia, J., concurring). And the text of section 1201(a) can easily be read in a manner consistent with the FMA. In contrast, the Studios' interpretation of the DMCA renders the FMA both meaningless and superfluous. As such, their interpretation should be rejected. *Watt*

42

*v. Alaska*, 451 U.S. 259, 267 (1981) (courts "must read the statutes to give effect to each if [they] can do so while preserving their sense and purpose").

### D. Any Technical Violation Of Section 1201(a) By VidAngel Is A Protected Fair Use.

Since the passage of the first Copyright Act in 1790, the text of the statute has made impermissible numerous activities that are nonetheless socially beneficial. Thus, the judiciary quickly developed the "fair use" doctrine. *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. Oct. 1, 1841). Fair use was exclusively a common law doctrine until 1976, when it was partially codified. *Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 141 (2d Cir. 1998).

Consistent with its origin, fair use today ensures the persistence of socially beneficial conduct even when the Copyright Act textually prohibits such activities. *Stewart v. Abend*, 495 U.S. 207, 236 (1990). The Supreme Court has also made clear that fair use is a vital "'traditional contour' of copyright protection," and a "speech-protective * * * safeguard[]," which, if disturbed, could cause a conflict with the First Amendment. *Golan v. Holder*, 132 S. Ct. 873, 890 (2012) (citation omitted).

43

This Court has expressly left undecided whether fair use applies to the portion of the Copyright Act containing the DMCA (section 1201). *Blizzard*, 629 F.3d at 958 n.12. It does.[40]

All content is now either digital or capable of being digitized, and is thus capable of being encrypted or otherwise protected by access and copy control measures. Under the Studios' interpretation of the DMCA, authorization to decrypt can be granted conditionally to police content *use*. Absent a fair use defense, content creators could prevent anyone anywhere from using their content for any reason. The Studios want this. But society should not.

For example, an artist who wished to create a parody—a classic fair use— might purchase and rip a DVD to access its contents for that purpose. *Campbell*, 510 U.S. 569. The Studios insist that even such a traditional, core fair use would be prohibited by the DMCA so long as the Studios encrypted the DVD and did not consent to the artist's conduct. Such a result would make fair use meaningless.

---

[40] Section 1201(a)(1)(D) is plainly not intended to be the exclusive safeguard for fair use under the DMCA. Congress instructed the Librarian to determine whether anti-circumvention adversely affects non-infringing uses "of a particular class" of works every three years. 17 U.S.C. § 1201(a)(1)(C). Not all fair uses can be identified in advance by class, and many can emerge over three years. This provision underscores the importance of applying fair use to anti-circumvention and arms the Librarian to do so in certain settings amenable to rulemaking. It does not indicate that Congress intended to foreclose this traditional defense in individual cases.

Or imagine that someone discovers that Studio executives have circulated to fringe groups a previously unknown movie that extols election rigging and have encrypted the DVD to require a ten-digit passcode to view. This individual wants to decrypt the DVD and circulate newsworthy portions of its contents to the public; again, a classic fair use. The Studios assert that the DMCA would prohibit such socially beneficial activity, no matter how newsworthy the underlying content or how obvious a fair use. That too is not, and should not be, the law.

In short, the Studios assert that the DMCA prohibits socially beneficial activity no matter how fair the use as long as the Studios withhold their consent to decrypt in a particular manner. If the fair use doctrine does not apply to the DMCA, anyone can protect anything from dissemination under the DMCA, and can stop *any* fair use in its entirety, through the mere expedient of encrypting the underlying material. That is surely not the world Congress intended.

Properly construed, the text of the DMCA itself mandates the availability of a fair use defense. After setting forth the various facial prohibitions of the DMCA in sections 1201(a) and (b), section 1201(c)(1) provides that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, *including fair use*, under this title." 17 U.S.C. § 1201(c)(1) (emphasis added). The statute thus squarely contemplates a fair use defense.

45

The statute refers to claims "under this title," and the DMCA is indeed under that title—Title 17 of the U.S. Code (entitled "Copyrights"). Thus, as noted intellectual property scholar Jane Ginsberg has argued, "the phrase 'including fair use,' as set off in commas, modifies not 'defenses applicable to copyright infringement,' but 'limitations under * * * this title'"; as a result, "fair use is a general limitation on rights set out in Title 17 * * * [and] § 1201(c) preserves fair use as to anti-circumvention as well." Jane C. Ginsberg, *Copyright Use and Excuse on the Internet*, 24 Colum.-VLA J.L. & Arts 8-9 (2000).

Nor does anything else in the text or legislative history of the DMCA suggest that it does not or should not incorporate the centuries-old doctrine. *See, e.g.*, Glynn S. Lunney, Jr., *The Death of Copyright: Digital Technology, Private Copying, and the Digital Millennium Copyright Act*, 87 Va. L. Rev. 813, 846 (2001) (explaining that Section 1201(c) preserved a fair use defense). The best interpretation of the DMCA is that it expressly requires consideration of a defense of fair use to claims under section 1201(a).[41]

---

[41] That interpretation also avoids running afoul of both the First Amendment and the limitations of the Copyright Clause itself, which authorizes Congress to afford copyright protection for a limited time, only "[t]o promote the Progress of Science." U.S. Const. Art. I, § 8, cl. 8. *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 666 F.3d 1216, 1223 (9th Cir. 2012) (noting that "[u]nder the canon of constitutional avoidance, the interpretation of the statute need not be the best reading, so long as it's 'fairly possible,'" and that there is "a duty to consider constitutional concerns and to adopt an interpretation that avoids

46

In any event, nothing in the DMCA *prohibits* the judicial application of a fair use defense. *See, e.g.*, Martha A. Field, *Sources of Law: The Scope of Federal Common Law*, 99 Harv. L. Rev. 881, 890 (1986) (noting that the creation of federal common law making, even in the face of hostile substantive provisions, is both permissible and a core judicial function in the absence of a congressional command to abstain).

The case for fair use as socially beneficial and even socially necessary is extremely strong here. Consider: *if* section 1201(a) is actionable even absent a nexus to infringing conduct (a question on which this Circuit and the Federal Circuit disagree), and *if* the Studios are correct that they can, through conditional access controls, impose use restrictions under section 1201(a), then nothing but fair use will allow ecrypted content to be used other than as the Studios bless. It cannot be that in 1998 Congress, with little fanfare, enacted a statute that, by the expedient of access-controls, granted content creators the complete control that fair use has denied them for two centuries. *See also* Burk & Cohen, *Fair Use Infrastructure for Rights Management Systems*, 15 Harv. J.L. & Tech. 41, 46 (2001) (explaining that fair use was intended to "adapt[] copyright to new technologies that pose challenges for the traditional copyright framework").

---

ruling on the constitutionality of a statute, if we can fairly do so") (quoting *I.N.S. v. St. Cyr*, 533 U.S. 289, 299-300 (2001)).

47

**III.  The District Court Abused Its Discretion In Finding That The Studios Demonstrated A Likelihood Of Irreparable Harm.**

A showing of irreparable harm is "perhaps the single most important prerequisite for the issuance of a preliminary injunction"—and the Studios utterly failed to make that showing. 11A Wright, Miller, & Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995). The district court's contrary finding rests on a forbidden presumption, not on actual evidence of impending injury. And the Studios' decision to ignore VidAngel fundamentally undermines their position.

**A.  Harm Must Be Proven, Not Presumed, And The Studios Offered No Evidence That VidAngel's Continued Operation During The Litigation Was Likely To Cause Irreparable Harm.**

The Studios did not prove that VidAngel's continued operation would cause irreparable harm to their multibillion-dollar businesses in the short time needed to reach a final judgment in this case. The district court both effectively adopted an impermissible presumption of harm and improperly credited the Studios' vague and speculative evidence, which lacked any direct connection to VidAngel.

First, by accepting the Studios' suggestion that mere "copyright interference" equates with irreparable harm, the district court essentially (and wrongly) presumed harm. The court reasoned that VidAngel's operation caused irreparable injury simply by interfering with the Studios' "'ability to control the use and transmission of their Copyrighted works.'" ER17 (citations omitted). But the Supreme Court and this Court have unequivocally disallowed presuming

48

irreparable harm. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006) (overruling Federal Circuit's "categorical grant" of injunctive relief for successful patent infringement claims); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011) ("[P]resuming irreparable harm in a copyright infringement case is inconsistent with, and disapproved by, the Supreme Court's opinions in *eBay* and *Winter*."). A party seeking preliminary relief must always "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).

The Studios' assertion of "copyright interference" as a form of irreparable harm is nothing more than a presumption by another name. It cannot substitute for a concrete, specific showing of actual injury. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (rejecting "categorical" rules and holding that a court "must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits"); *Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351, 355 (4th Cir. 2011) (irreparable harm may not be "based on the intangible nature of the copyright alone, as such reasoning would lead to the very presumption that *eBay* prohibits.").

Second, the Studios' vague and speculative evidence did not come close to showing that VidAngel's start-up operation poses a real and *immediate* threat to their business relationships and goodwill. Again, the teaching of *eBay*, *Winter*, and

49

*Flexible Lifeline* is that each part of the preliminary injunction standard must be applied rigorously. It is not enough to contend that infringing services generally are a concern or represent a potential loss of licensing revenue. The "extraordinary remedy" of a preliminary injunction, *Winter*, 555 U.S. at 24, can be justified only if VidAngel's continued operation poses an imminent risk of irreparable injury—that is, injury that will occur before this litigation is resolved and that cannot be remedied with money damages.

One critical fact illustrates why this record cannot support a preliminary injunction: as the Studios concede, no licensee has ever even mentioned, much less complained about, VidAngel. Their counsel admitted as much at the hearing below:

> THE COURT: * * * When you talk about irreparable harm in that vein, you talk about—and the goodwill, sort of, with licensees. Did—I just want to make sure I didn't miss the needle in the haystack of paper that's been filed. Have licensees specifically complained? Was there any sort of declarations that talk about, you know, iTunes, Amazon, saying, "Hey, what's going on here? Why am I paying when so-and-so doesn't have to do that?" Is there anything like that?
>
> MR. KLAUS: There is not, Your Honor.

ER156. The Studios' principal witness, Tedd Cittadine, the Senior Vice President of Digital Distribution at 20th Century Fox, ██████████████████ ████████████████████████████████ ER720-21. None of the other Studios even offered a witness, so Cittadine's testimony stands as the only

relevant evidence on this point— ███████████████████████ ██████████████████████████████ ER566, 720-21.

The crystal-clear record on this point confirms that the district court's findings far overstate the evidence. Citing Cittadine's declaration, the court found "that unlicensed services like VidAngel's had been specifically referenced as a concern during negotiation meetings with licensees" and "VidAngel's service undermines Plaintiffs negotiating position with licensees and also damages goodwill with licensees." ER18. But Cittadine's carefully worded declaration supplies nothing more than generalizations about "unlicensed services." He says that Fox's clients "worry" and "complain about" competing with (unnamed) unlicensed services. ER560-61. That is hardly surprising, given illegal file-sharing sites like Pirate Bay that offer free content.

Vague expressions of concern about unlicensed services are not enough. The Studios proffered no evidence specific to VidAngel and, indeed, supplied no specifics at all—no evidence of lost customers, no threats to terminate licenses, and no requests for more favorable terms. At most, the Studios speculated about their future interests, but speculation does not satisfy the demanding standard for a preliminary injunction. *Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011) ("[E]stablishing a threat of irreparable harm in the indefinite future is not enough.").

51

Further, the record lacks any evidence that monetary relief would be inadequate. Between VidAngel's meticulous records, ER542-43, and the Studios' knowledge of their licensing fees, monetary damages may readily be calculated and paid—to the penny—if liability is ultimately found at trial. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1339-40 (Fed. Cir. 2012) (concluding that district court clearly erred in finding irreparable harm from patent infringement because the plaintiff "broadly and extensively" pursued license fees for its technology and "no fact finder could reasonably conclude that [plaintiff] would be irreparably harmed by the payment of a royalty (a licensing fee)"). So too here. No injunction is justified.

## B.     The Studios' Year-Plus Delay Precludes A Preliminary Injunction.

Coupled with this scant evidentiary showing, the Studios' claim of urgency also lacks credibility, given their previously unhurried approach to VidAngel and this litigation. This Court has held that "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). That holding fits perfectly here.

VidAngel sent the Studios detailed letters describing its business model in the summer of 2015. Disney even opened a VidAngel account then. ER530, 551. Yet the Studios waited nearly a year before filing suit in June 2016, waited another

52

two months before seeking a preliminary injunction, and were content with a three-month delay to hear that request. If the Studios were truly threatened with imminent harm, they would have acted expeditiously to protect their rights—not waited well over a year. Indeed, courts regularly hold that delays of this kind are sufficient to deny preliminary relief. *See* 11A Wright, Miller, & Kane, *Federal Practice and Procedure* § 2948.1 n.13 (collecting cases).

The Studios persuaded the district court that it was "reasonable" for them to "monitor" VidAngel and delay filing suit (or, indeed, take any action at all) until they perceived a "more significant threat." ER19. But the relevant question is not whether it was reasonable for the Studios to gamble that VidAngel would disappear or fail, making litigation unnecessary. Instead, the question here is whether the Studios can persuasively demonstrate that VidAngel suddenly and inexplicably morphed from too insignificant to warrant even a cease-and-desist letter, to a dangerous threat that the Studios cannot withstand for even a few months. They cannot.

## IV. The Balancing Of Hardships Requires Reversal.

The balancing of the hardships here is stark: the preliminary injunction risks destroying VidAngel's business, while leaving it in place until final judgment will cause little or no harm to the Studios. VidAngel had no choice but to completely close its streaming business to comply with the preliminary injunction. ER28, 56-

53

57. As a result, its customers can no longer watch any streamed movies, not even the discs they permanently own. ER28. VidAngel's employees worked nonstop to comply with the injunction as to the Studios' works while still streaming other content, but it was not technologically feasible. ER28, 52-56, 72-74. Every month that VidAngel is shut down (completely or "just" with respect to 56% of its business, ER84) it risks the irreparable loss of goodwill, customers, and employees.

The crippling effect of the preliminary injunction on VidAngel's business weighs decisively against the Studios' belated demand for preliminary injunctive relief. *Winter*, 555 U.S. at 24 ("[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."). The district court's failure to consider the injunction's devastating consequences for this fledgling business requires reversal. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("[T]he district court has a duty * * * to balance the interests of all parties and weigh the damage to each."); *Los Angeles Mem. Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980) ("The district court * * * failed to identify the harms which a preliminary injunction might cause to defendants and to weigh these against plaintiff's threatened injury."); *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d

54

819, 827 (9th Cir. 1993) (finding that in balancing hardships, "relative size and strength of each enterprise may be pertinent").

The lower court disregarded the overriding threat to VidAngel's existence by reasoning that VidAngel's practices were likely infringing and thus warranted no consideration. But that circular reasoning collapses two separate inquiries: the plaintiff's likelihood of success and the risk of harm to the defendant if wrongly enjoined. *Winter* and *eBay*, however, confirm that the preliminary injunction standard must not be collapsed and that traditional equitable principles must be applied *in each case*. *Winter*, 555 U.S. at 23-25; *eBay*, 547 U.S. at 391-93 (entry of injunction is not automatic and district court's "discretion must be exercised consistent with traditional principles of equity"). The cases cited by the district court predate *Winter* and *eBay*, and their reasoning is accordingly not controlling. *See Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335-38 (9th Cir. 1995) (applying presumption of irreparable harm and reasoning that harm to defendant was not cognizable); *Apple Comput., Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 525 (9th Cir. 1984) (presuming irreparable harm), *overruled by Flexible Lifeline*, 654 F.3d at 989.

Instead of ignoring the imminent likelihood that the requested injunction would put VidAngel out of business, the district court should have denied the injunction altogether given how sharply the equities favor VidAngel. *Cf. Winter*,

55

555 U.S. at 23 (consideration of public interest and Navy's interest required denying injunction, even if plaintiffs had established irreparable harm.). At a minimum, the court should have applied settled precedent and held the Studios to a higher standard in showing likelihood of success on the merits, particularly since the required merits showing in preliminary injunction cases varies with the "relative hardship to the parties." *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978).

VidAngel has relied in good faith on the FMA and Congress's intent to allow American families access to filtering technology. The Studios' case turns on unsettled questions of law. Where the questions posed are novel and an injunction would destroy the defendant's business, equity counsels decisively against the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 24.

## IV. The Injunction Harms The Public Interest.

Finally, the preliminary injunction thwarts viewers' rights, enshrined in the FMA, to filter content to which they object, and should be overturned for this reason alone. When, as here, "'an injunction is asked which will adversely affect a public interest * * * the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'" *Stormans*, 586 F.3d at 1139 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982)). "In exercising their sound

56

discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 23-24.

This is just such a case. Here, "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences," *Stormans*, 586 F.3d at 1138-39, by hampering the right to filter copyrighted content that Congress codified in the FMA. *See Golden Gate Rest. Ass'n v. City of San Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008) ("The public interest may be declared in the form of a statute.") (quoting 11A Wright, Miller, & Kane, *Federal Practice and Procedure* § 2948.4, at 207 (2d ed. 1995)). And the Supreme Court has "repeatedly recognized the governmental interest in protecting children from harmful materials." *Reno v. ACLU*, 521 U.S. 844, 875 (1997). VidAngel furthers this important interest by enabling viewers to effectively outsource on-demand access to the hardware and knowhow needed to filter out objectionable content. Significantly, it is the only service currently available that works with mobile devices, tablets, and SmartTVs—the viewing methods predominantly used by consumers of all ages. ER480-81, 540.

The district court brushed this key public interest aside, pointing out that VidAngel could simply provide a service similar to ClearPlay's. ER20. ClearPlay, however, relies on YouTube's streaming platform (which Google owns) and

therefore works only with Google Play. ER222-23. Before adopting its current model, VidAngel attempted to create a service like ClearPlay's, but it was thwarted and notified that such filtering violated YouTube's terms of service. ER223, 524-58.

Moreover, ClearPlay's service falls well short of enabling consumers to enjoy the rights embodied in the FMA. ClearPlay works only with Google Play, only via a Macintosh or Windows computer using a Google Chrome browser (rendering it incompatible with most devices and content platforms), and only with standard-definition content (whereas public demand seeks high-definition and Blu-ray content). ER222-24, 477-78, 514-19. Moreover, it does not work on more than 9% of the Google Play movie database, including popular titles like the entire *Star Wars* collection. ER224. Finally, it is difficult to use, works poorly with certain platforms it claims compatibility with, and often stops working. ER222-26. It is no substitute for VidAngel's user-friendly, effective filtering service, as evidenced by the strong support VidAngel enjoys from viewers and community leaders, as well as by the sheer number of customers who use VidAngel rather than ClearPlay.[42]

Meanwhile, by requiring VidAngel to shut down its entire business, ER28, the injunction blocks access to the many thousands of discs in VidAngel's vault owned outright by many thousands of VidAngel users and precludes the public

---

[42] *See* ER350-440.

from using VidAngel to filter content from the multitude of rights holders not involved in this litigation. ER83-84. And the ruling threatens to destroy the market for filtered content, and frustrate the FMA's policy aim, by chilling the development of similar technologies.

## CONCLUSION

For the foregoing reasons, the injunction should be dissolved.

Dated: January 11, 2017

Brendan S. Maher
   brendan.maher@strismaher.com
Daniel L. Geyser
   daniel.geyser@strismaher.com
Douglas D. Geyser
   douglas.geyser@strismaher.com
STRIS & MAHER LLP
6688 N. Central Expressway, Suite 1650
Dallas, TX 75206
Tel: (214) 396-6630
Fax: (210) 978-5430

David W. Quinto
   dquinto@vidangel.com
VIDANGEL, INC.
3007 Franklin Canyon Drive
Beverly Hills, CA 90210
Tel: (213) 604-1777
Fax: (213) 604-1777

Shaun P. Martin
   smartin@sandiego.edu
UNIVERSITY OF SAN DIEGO
SCHOOL OF LAW
5998 Alcala Park
San Diego, CA 92110
Tel: (619) 260-2347
Fax: (619) 260-7933

Respectfully submitted,

s/ Peter K. Stris
Peter K. Stris
   peter.stris@strismaher.com
Elizabeth Rogers Brannen
   elizabeth.brannen@strismaher.com
Dana Berkowitz
   dana.berkowitz@strismaher.com
Victor O'Connell
   victor.oconnell@strismaher.com
STRIS & MAHER LLP
725 South Figueroa Street, Suite 1830
Los Angeles, CA 90017
Tel: (213) 995-6800
Fax: (213) 261-0299

Ryan Geoffrey Baker
   rbaker@bakermarquart.com
Jaime Wayne Marquart
   jmarquart@bakermarquart.com
Scott M. Malzahn
   smalzahn@bakermarquart.com
BAKER MARQUART LLP
2029 Century Park East, 16th Floor
Los Angeles, CA 90067
Tel: (424) 652-7800
Fax: (424) 652-7850

*Counsel for Defendant-Appellant*
VidAngel, Inc.

60

## STATEMENT OF RELATED CASES

There are no known related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Court Rule 32-1 because it contains 13,752 words, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

Undersigned counsel certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word 2013.

Dated: January 11, 2017                    s/ Peter K. Stris
                                           Peter K. Stris

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## CERTIFICATE OF SERVICE
## SEALED DOCUMENTS
## INTERIM CIRCUIT RULE 27-13

**Case Number:** 16-56843

**Case Title:** VidAngel, Inc. v. Disney Enterprises, Inc., et al.

*Note:* Documents to be filed under seal are to be submitted electronically. As the parties will not have online access to those documents once they are submitted, the CM/ECF electronic notice of filing will not act to cause service of those documents under FRAP 25(c)(2) and Ninth Circuit Rule 25-5(f). Interim Circuit Rule 27-13(c) therefore requires an alternative method of serving the motion or notice to seal and the materials to be sealed.

○ I certify that I have provided a paper copy of the document(s) listed below to all other parties via personal service, mail, or third-party commercial carrier on the date noted below. *See* FRAP 25(c)(1)(A) – (C).

◉ I certify that, having obtained prior consent, I have provided a copy of the document(s) listed below to all other parties via electronic mail. *See* FRAP 25(c)(1)(D); Interim Circuit Rule 27-13(c).

## DESCRIPTION OF DOCUMENTS:

Motion to File Its Opening Brief and Excerpts of Record, Volume V, Under Seal
Appellant's Opening Brief
Appellant's Opening Brief [Redacted]
Excerpts of Record, Volume V

**Signature:** s/ Peter K. Stris

(use "s/" format with typed name)

**Date:** January 11, 2017